## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

|  |  |  |
|---|---|---|
| LIFENET, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 6:22-cv-162-JDK |
| | § | |
| UNITED STATES DEPARTMENT OF | § | |
| HEALTH AND HUMAN SERVICES, | § | |
| et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff LifeNet, Inc. challenges an interim final rule issued pursuant to the No Surprises Act ("Act"). The Rule is nearly identical to the one this Court set aside in *Texas Medical Association v. United States Department of Health and Human Services, et al.*, 2022 WL 542879, at *1 (E.D. Tex. Feb. 23, 2022) (hereinafter *TMA*). Seeking to avoid that outcome here, Defendants ask the Court to transfer the case to another forum. A transfer, however, would waste resources and potentially create inconsistent judgments. Accordingly, the Court **DENIES** Defendants' motion to transfer (Docket No. 22).

Further, for the reasons stated in *TMA*, the Court concludes that the Rule must be set aside under the Administrative Procedure Act ("APA"). The Court thus **GRANTS** LifeNet's motion for summary judgment (Docket No. 27) and **DENIES** Defendants' cross-motion for summary judgment (Docket No. 31).

**I.**

The facts underlying this case are the same as those set forth in detail in *TMA*. *See* 2022 WL 542879, at *1.

**A.**

The No Surprises Act was enacted on December 27, 2020, as part of the Consolidated Appropriations Act of 2021 to address "surprise medical bills." Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758–2890 (2020). Generally, the Act limits the amount an insured patient will pay for emergency services furnished by out-of-network providers and for certain non-emergency services furnished by an out-of-network provider at an in-network facility. 42 U.S.C. §§ 300gg-111, 300gg-131, 300gg-132.[1]

As explained in *TMA*, the Act also establishes an independent dispute resolution ("IDR") process to determine the amount insurers must pay such out-of-network providers. *See TMA*, 2022 WL 542879, at *1 (citing § 300gg-111(a)(1)(C)(iv), (b)(1)(C)). In the IDR process, the provider and insurer each submit a proposed payment amount and explanation to an arbitrator, who then selects one of the two amounts, "taking into account the considerations specified in subparagraph (C)." *See id*. (citing § 300gg-111(c)(5)(A)–(B)). Subparagraph (C) in turn requires the arbitrator to consider "the qualifying payment amount" and five "additional circumstances," including the provider's

---

[1] The Act amended three statutes: the Public Health Service Act ("PHSA") (administered by the Department of Health and Human Services), the Employee Retirement Income Security Act ("ERISA") (administered by the Department of Labor), and the Internal Revenue Code (administered by the Department of the Treasury). For ease of reference, this Opinion cites to the PHSA.

training and experience, the market share held by the provider, and any good faith efforts made by the provider to enter into network agreements.  *Id*.  The qualifying payment amount, or "QPA," is typically the median rate the insurer would have paid for the service if provided by an in-network provider or facility.  *Id*. at *2.[2] Finally, the Act directs federal agencies to implement the IDR process by regulation, consistent with the Act.  *Id*. at *3 (citing § 300gg-111(c)(2)(A)).

The problem identified in *TMA* was that the agencies implemented an interim final rule that *conflicted* with the Act.  Rather than instructing arbitrators to consider all the factors pursuant to the Act, the rule required arbitrators to "select the offer closest to the [QPA]" unless "credible" information, including information supporting the "additional factors," "clearly demonstrates that the [QPA] is materially different from the appropriate out-of-network rate."  *See TMA*, 2022 WL 542879, at *8 (quoting 45 C.F.R. § 149.510(c)(4)(ii)(A)).  The Court explained:

> The [agencies] in fact characterize the non-QPA factors as "permissible additional factors" that may be considered only "when appropriate."  86 Fed. Reg. at 56,080.  The Rule thus places its thumb on the scale for the QPA, requiring arbitrators to presume the correctness of the QPA and then imposing a heightened burden on the remaining statutory factors to overcome that presumption.

*Id*.  Because the rule "rewrites clear statutory terms," the Court held it unlawful and set it aside under the APA, 5 U.S.C. § 706(2)(A).  *See id*. at *9 (citing *Util. Air*

---

[2] The Act defines the QPA as "the median of the contracted rates recognized by the plan or issuer . . . under such plans or coverage, respectively, on January 31, 2019, for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item[s] or service is furnished," with annual increases based on the consumer price index. § 300gg-111(a)(3)(E)(i)(I)–(II).

*Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014)).  The Court also set the rule aside on the alternative ground that it was issued without notice and comment.  *See id.* at *14.

### B.

LifeNet now challenges a nearly identical interim final rule ("the Rule") that applies to air ambulance service providers.

The Rule purports to implement § 300gg-112 of the Act, which establishes a similar IDR process for determining payments to out-of-network providers of air ambulance services.  Like the statutory provision in *TMA*, § 300gg-112 requires the provider and insurer each to submit a proposed payment amount and explanation to an arbitrator in a "baseball-style" arbitration.  § 300gg-112(b)(5)(B).  The arbitrator must then select one of the two proposed amounts, "taking into account the considerations specified in subparagraph (C)."  300gg-112(b)(5)(A).  Subparagraph C states as follows:

(C) Considerations in determination

(i) In general

In determining which offer is the payment to be applied pursuant to this paragraph, the certified IDR entity, with respect to the determination for a qualified IDR air ambulance service shall consider-

(I) the qualifying payment amounts (as defined in section 300gg-111(a)(3)(E) of this title) for the applicable year for items or services that are comparable to the qualified IDR air ambulance service and that are furnished in the same geographic region (as defined by the Secretary for purposes of such subsection) as such qualified IDR air ambulance service; and

(II) subject to clause (iii), information on any circumstance described in clause (ii), such information as requested in subparagraph (B)(i)(II), and any additional information provided in subparagraph (B)(ii).

(ii) Additional circumstances

For purposes of clause (i)(II), the circumstances described in this clause are, with respect to air ambulance services included in the notification submitted under paragraph (1)(B) of a nonparticipating provider, group health plan, or health insurance issuer the following:

(I) The quality and outcomes measurements of the provider that furnished such services.

(II) The acuity of the individual receiving such services or the complexity of furnishing such services to such individual.

(III) The training, experience, and quality of the medical personnel that furnished such services.

(IV) Ambulance vehicle type, including the clinical capability level of such vehicle.

(V) Population density of the pick up location (such as urban, suburban, rural, or frontier).

(VI) Demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or nonparticipating facility or the plan or issuer to enter into network agreements and, if applicable, contracted rates between the provider and the plan or issuer, as applicable, during the previous 4 plan years.

§ 300gg-112(b)(5)(C). The arbitrator's selection of a payment amount is binding on the parties and is not subject to judicial review, except under the circumstances described in the Federal Arbitration Act. § 300gg-112(c)(5)(D) (incorporating § 300gg-111(c)(5)(E)).

Pursuant to § 300gg-112(b)(2)(A), Defendants—the Departments of Health and Human Services, Labor, and the Treasury—implemented the Rule challenged here. Requirements Related to Surprise Billing: Part II, 86 Fed. Reg. 55,980 (Oct. 7,

2021).  The Rule expressly incorporates the rule at issue in *TMA*, with only a slight modification.  The Rule states:

> Except as provided in paragraphs (b)(2) and (3) of this section, in determining the out-of-network rate to be paid by group health plans and health insurance issuers offering group or individual health insurance coverage for out-of-network air ambulance services, plans and issuers must comply with the requirements of § 149.510 [the rule at issue in *TMA*], except that references in § 149.510 to the additional circumstances in § 149.510(c)(4)(iii)(C) shall be understood to refer to paragraph (b)(2) of this section.

45 C.F.R. § 149.520(b)(1).[3]  Paragraph (b)(2) lists "additional information" for the arbitrator to consider, which mirrors the "additional circumstances" in § 300gg-112 of the Act.  *Compare* § 149.520(b)(2), *with* 42 U.S.C. § 300gg-112(b)(5)(C)(ii)(I)–(VI).  And like the rule in *TMA*, the Rule governing air ambulance services states that this "additional information" "must also clearly demonstrate that the [QPA] is materially different from the appropriate out-of-network rate."   45 C.F.R. § 149.520(b)(2).

Thus, the Rule does exactly what the Court ruled unlawful in *TMA*:  it creates a QPA presumption by requiring the arbitrator to select the QPA unless "credible" information "clearly demonstrate[s] that the [QPA] is materially different from the appropriate out-of-network rate."  *Compare* 45 C.F.R. § 149.520(b)(2), *with TMA*, 2022 WL 542879, at *8 (quoting 45 C.F.R. § 149.510(c)(4)(ii)(A)).

---

[3] As with the Act, identical rules appear in three separate sections of the C.F.R., specifically Title 45 – Public Health, Title 26 – Internal Revenue, and Title 29 – Labor.  For ease of reference, this Opinion cites to Title 45.

## C.

Despite the Court's ruling in *TMA*, Defendants have continued to apply the QPA presumption to air ambulance service providers.   Docket No. 27 at 10; *see* Docket No. 31 at 12 n.3.   Accordingly, LifeNet, an air ambulance service provider transporting "hundreds of patients each year," filed this lawsuit and shortly thereafter moved for summary judgment.   Docket Nos. 1 ¶ 1; Docket No. 27.

Like the plaintiffs in *TMA*, LifeNet challenges the Rule under the APA, arguing that it improperly requires arbitrators to give "greater weight" to a single statutory factor, the QPA, and in so doing "deviates from the statute."   Docket No. 1 ¶ 29.   LifeNet also argues that the Rule was issued without the required notice and comment.   Docket No. 1 ¶ 32–39.   Accordingly, LifeNet requests that the Court vacate and set aside the final sentence of 45 C.F.R. § 149.520(b)(2) and the identical provisions found in Titles 26 and 29 of the Code of Federal Regulations.[4]   Docket No. 1 ¶¶ 23 n.3, 27, 60.

## II.

Defendants argue that this case should be transferred to the U.S. District Court for the District of Columbia under the "first-to-file rule."   Docket No. 22 at 1. Defendants contend that *Association of Air Medical Services v. U.S. Department of Health & Human Services*, 1:21-cv-03031-RJL (D.D.C.), which was filed in November 2021 by a different plaintiff challenging the same rule, is the first-filed

---

[4] Although LifeNet also asks the Court to vacate "the six regulatory provisions identified . . . at paragraph 27," it recognizes that those provisions "were expressly vacated by the *TMA* decision." Docket No. 1 ¶ 27.

case and that "[c]onsiderations of comity and the orderly administration of justice" counsel in favor of a transfer. *Id.* at 3. The Court disagrees.

### A.

The first-to-file rule is "a discretionary doctrine" based on "principles of comity and sound judicial administration." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999) (citing *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997)). Under the rule, "when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Id.* The rule's purpose is "to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 (5th Cir. 1985). The Fifth Circuit has stressed that the rule is discretionary, particularly for suits seeking injunctive relief, holding that "while a district court *may* dismiss an injunction suit if duplicative litigation is pending in another jurisdiction, it is not *required* to do so." *Harris Cnty., Tex. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 319 (5th Cir. 1999).

To apply the rule, the second-filed court must determine if the parties have shown a "likelihood of substantial overlap" between the suits. *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 (5th Cir. 1971). If so, the first-filed court is generally better suited to decide whether to consolidate the cases, and the second-filed court will often transfer, stay, or dismiss the second-filed duplicate action. *Id.*; *Save Power*, 121 F.3d at 950; *W. Gulf*, 751 F.2d at 729 n.1. Even when there is

8

substantial overlap, however, the second-filed court may nonetheless decline to apply the first-to-file rule based on "compelling circumstances." *Mann*, 439 F.2d at 407; *see also, e.g.*, *Tex. Instruments Inc. v. Micron Semiconductor, Inc.*, 815 F. Supp. 994, 997 (E.D. Tex. 1993) ("[T]he decision of whether to apply the first-to-file rule is discretionary, and involves determinations concerning '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'") (quoting *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952)).

Here, as explained below, the rule does not apply because the first-filed case is *TMA*, not *Air Medical*, and in any event, compelling circumstances counsel against transferring the case to the D.C. district court.

## B.

To determine whether there is "substantial overlap" between two cases, courts consider whether "the core issue . . . was the same" and if "much of the proof adduced . . . would be identical" between the two lawsuits. *Int'l Fid. Ins. Co. v. Sweet Little Mexico Corp.*, 665 F.3d 671, 678 (5th Cir. 2011) (citing *W. Gulf*, 751 F.2d at 730 and *Mann*, 439 F.2d at 407). "Complete identity of parties is not required" to find substantial overlap. *Save Power*, 121 F.3d at 951. When there is "less than complete" overlap, "'the judgment is made case by case, based on such factors as the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute.'" *Id.* at 951 (quoting *TPM Holdings, Inc. v. Intra–Gold Indus., Inc.*, 91 F.3d 1, 4 (1st Cir. 1996)).

9

Defendants argue that the first-filed case is *Air Medical* because that was the first case challenging the Rule governing air ambulance services.  But *TMA*—which was filed two weeks before *Air Medical*—challenged the identical wording of a nearly-identical rule, as described in detail above.  *Compare* 45 C.F.R. §§ 149.510(c)(4)(iii)(C) and 149.510(c)(4)(ii)(A), *with* 45 C.F.R. § 149.520(b)(2).  The "core issue" in *TMA* is thus the same as the issue here:  whether Defendants' establishing a QPA presumption in the IDR process violates the Act.  The textual arguments challenging and defending that presumption are the same.  And the legal authorities and policy arguments are nearly identical.  In fact, Defendants' briefing in the two cases is almost verbatim, while LifeNet's briefing relies heavily on this Court's opinion in *TMA*.  It does not matter that the rule at issue in *TMA* is found in a different line of the Code of Federal Regulations than the Rule challenged here, or that the two rules vary in insignificant ways.  *See Save Power*, 121 F.3d at 951 (two cases can "substantially overlap" even when the overlap is "less than complete").  Nor does it matter that the plaintiffs in the two cases are not identical.  *See, e.g.*, *id.*; *W. Gulf*, 751 F.2d at 731 n.5.

The Court thus concludes that *TMA* "substantially overlaps" with this case and should be considered the "first-filed case."  *Int'l Fid. Ins. Co.*, 665 F.3d at 678.

## C.

Even if *Air Medical* were the first-filed case, "compelling circumstances" counsel against transferring the matter.  *Mann*, 439 F.2d at 407; *see also, e.g.*, *Truinjec Corp. v. Nestle S.A.*, 2020 WL 6781578, at *2 (E.D. Tex. Nov. 18, 2020).

This Court has already interpreted the Act and a nearly identical rule establishing the IDR process.  *See TMA*, 2022 WL 542879, at *1–15.  In doing so, the Court expended a substantial amount of time and effort analyzing the statutory and regulatory texts, addressing Defendants' defense of the regulations—including complex standing issues raised both in *TMA* and here—and resolving various disputes about the APA notice-and-comment requirement.  *See id.*  Transferring the case to D.C., where the court has not yet ruled on any of those issues, would waste judicial resources.  *Mobility Elecs., Inc. v. Am. Power Conversion Corp.* 2007 WL 9724768, at *4 (E.D. Tex. Oct. 10, 2007) (a court's "involvement in two related proceedings favors denying [the transfer] motion" under the first-to-file rule because of the "wisdom of allowing a judge who has familiarity with the subject matter at issue to preside over subsequent litigation"); *see also, e.g.*, *Network-1 Sec. Sols., Inc. v. D-Link Corp.*, 433 F. Supp.2d 795, 802 (E.D. Tex. 2006) (recognizing advantages of having a judge "who had already construed the patent claims and examined its voluminous file history" preside over case).

A transfer would also likely delay resolution of this case, which is particularly important considering that thousands of claims have already been submitted to the IDR process by air ambulance providers.  Docket No. 19 at 3; *see also* Tr. of Oral Arg. at 35–36, *Ass'n of Air Med. Servs.*, 1:21-cv-03031-RJL (D.D.C. March 24, 2022) (ECF No. 57) (indicating that the court may not rule on the summary judgment motions quickly).  And a transfer would result in inconsistent rulings if the D.C. court upholds the Rule, thereby rejecting this Court's reasoning and analysis in

*TMA*.  A transfer would thus do nothing to fulfill the purposes underlying the first-to-file doctrine:  to "avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *W. Gulf*, 751 F.2d at 729; *cf., e.g.*, *Tex. Instruments Inc.*, 815 F. Supp. at 997 (vacating prior transfer order and staying case to "giv[e] regard to conservation of judicial resources and comprehensive disposition of litigation").

"Exceptions [to the first-to-file rule] . . . 'are not rare, and are made when justice or expediency requires.'"  *SIPCO, LLC v. Emerson Elec. Co.*, 2016 WL 7743496, at *4 (E.D. Tex. July 1, 2016) (quoting *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993), *abrogated on other grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995)).  Because compelling circumstances exist here, the Court declines to exercise its discretion to transfer the case under the first-to-file rule.

\*     \*     \*

Defendants' motion to transfer or change venue (Docket No. 22) is **DENIED**.

### III.

The Court turns now to the parties' cross-motions for summary judgment.

Both sides move for summary judgment under Federal Rule of Civil Procedure 56.  Docket Nos. 27, 31.  Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P.

56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  Here, both sides agree that the Court can determine LifeNet's APA challenge as a matter of law.

## A.

Defendants first argue—as they did in *TMA*—lack of standing.  Defendants claim that LifeNet "is paid for its services by Air Methods Corporation, a national air ambulance company provider that contracts with local partners," that the payment is "an agreed amount of compensation," and that Air Methods "is responsible for collecting reimbursement from other [insurers]." Docket No. 31 at 13.  As a result, Defendants argue, LifeNet "suffers no injury-in-fact from the operation of th[e] [challenged] regulation." *Id.* at 15.  Defendants also contend that granting relief to LifeNet would not redress any alleged injury.  *See id.*  For many of the same reasons provided in *TMA*, the Court disagrees.

"The irreducible minimum constitutional standing requirement to invoke a federal court's article III jurisdiction is (1) injury-in-fact (2) fairly traceable to the defendant's actions and (3) likely to be redressed by a favorable decision." *Ensley v. Cody Res., Inc.*, 171 F.3d 315, 319 (5th Cir. 1999) (citing *Raines v. Byrd,* 521 U.S. 811, 818 (1997); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 472 (1982)).

Here, LifeNet has established at least three injuries fairly traceable to the Rule.

*First*, LifeNet has shown that it is an "object" of the Rule, which means there is "little question that the action or inaction has caused [it] injury.'" *Contender*

*Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015) (citing *Lujan*, 504 U.S. at 561–62); *see also, e.g.*, *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 2022 WL 1577222, at *6 (E.D. Tex. Mar. 18, 2022) ("[S]ubjects of regulations generally have standing to challenge the rule or statute.") (citing *Contender Farms*, 779 F.3d at 264–65). LifeNet is an "object" of the Rule because it is a "nonparticipating provider" whose air ambulance services are subject to the Rule. Docket No. 27 at 17–18. Indeed, the Act defines a "nonparticipating provider" as "a physician or other health care provider . . . who does not have a contractual relationship with the plan or issuer, respectively, for furnishing such item or service under the plan or coverage, respectively." 42 U.S.C. § 300gg-111(a)(3)(G)(i); *id.* § 300gg-112(c)(3) (adopting same definition for air ambulance service providers). And LifeNet "provides air ambulance services" and is not "an 'in-network' provider" because "many ERISA health plans . . . have refused" to contract with LifeNet. Docket No. 27, Ex. 2 ¶¶ 2, 7 (Affidavit of James L. Gaines, General Counsel of LifeNet). Thus, LifeNet is an object of and regulated by the Rule.

Defendants argue that LifeNet is "not an object of the regulation" because Air Methods pays LifeNet directly and "only Air Methods will submit its offers for decision to an arbitrator." Docket No. 31 at 15. But whether "someone is in fact an object of a regulation is a flexible inquiry rooted in common sense." *Contender Farms*, 779 F.3d at 265 (citing *Duarte ex rel. Duarte v. City of Lewisville, Tex.*, 759 F.3d 514, 517 (5th Cir. 2014) (family members of registered sex offender had standing to challenge ordinance regulating sex offenders)). And, although LifeNet

14

is paid by Air Methods, LifeNet's services will be analyzed and valued in the IDR process pursuant to the Rule.  Docket No. 27, Ex. 2 ¶¶ 6–10.  It is LifeNet—not Air Methods—whose training, experience, and quality and outcome measurements are to be considered by the arbitrator.  *See* § 300gg-112(b)(5)(C); *see also TMA*, 2022 WL 542879, at *6.  LifeNet is therefore a "nonparticipating provider" under the Act and has standing to challenge the Rule as an object of it.  *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 585–86 (7th Cir. 2011) (truckers had standing as "objects" of the challenged rule); *TMA*, 2022 WL 542879, at *6.

*Second*, as explained in *TMA*, LifeNet will suffer a procedural injury because the Rule deprives it of the arbitration process established by the Act.  Docket No. 27 at 19.  Rather than having an arbitrator consider all statutory factors as provided by the Act, the Rule puts a substantial "thumb on the scale" in favor of the QPA.  *See id.*; *id.*, Ex. 2 ¶¶ 7–11 (Declaration of LifeNet, Inc.); Docket No. 1 ¶ 3 (quoting *TMA*, 2022 WL 542879, at *8).  Further, LifeNet contends that the offers submitted to arbitrators for air ambulance services will "in many and perhaps all cases be above the QPA," the result of which will be to "strip away" the measures Congress put in place to "protect the economic interests of air ambulance providers like LifeNet."  Docket No. 27 at 19; *id.*, Ex. 2 ¶ 7.  This claimed procedural injury is sufficient to confer Article III standing.  *TMA*, 2022 WL 542879, at *4 (similarly situated plaintiffs had standing because of procedural injury); *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) ("A plaintiff can show a cognizable injury if [he] has

been deprived of a 'procedural right to protect [his] concrete interests.'") (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.8 (1992).[5]

*Third*, LifeNet has established that it will likely suffer financial harm from the Rule because—as Defendants acknowledge—the Rule's QPA presumption "will drive out-of-network reimbursement rates to the QPA as a de facto benchmark." *TMA*, 2022 WL 542879, at *5. This "in turn will cause LifeNet's compensation to decrease significantly." Docket No. 27 at 20 (citing *id.*, Ex. 2 ¶ 11); Docket No. 31 at 18–22. Although LifeNet is presently paid a fixed amount from Air Methods under the parties' contract, LifeNet has shown a significant risk of losing the contract with Air Methods—and thus all related profits—because of the Rule. Docket No. 27 at 20. The contract permits Air Methods to terminate the agreement if a "financially unviable situation" occurs. *Id.*, Ex. 3 ¶¶ 3–4. And when the QPA presumption drives down reimbursement rates, such an "unviable situation" is likely to occur. Docket No. 27, Ex. 3 ¶ 4. An unviable situation, moreover, would almost certainly result in LifeNet's having to renegotiate its contract for a lower payment amount— or losing the contract altogether. *Id.* at ¶¶ 3, 4. As the Court held in *TMA*, such "economic injury is a quintessential injury upon which to base standing." *El Paso*

---

[5] Defendants argue that LifeNet cannot show a procedural injury because it has "failed to show that it suffers any concrete injury from the regulation," and a "deprivation of a procedural right without some concrete interest . . . is insufficient to create Article III standing." Docket No. 31 at 17 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). But as explained *infra*, LifeNet has shown a concrete financial injury from the Rule.

*Cnty., Tex. v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020) (quoting *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006)).

Defendants argue that LifeNet's alleged financial injury is "utterly speculative." Docket No. 31 at 16. Defendants cite *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 458 (5th Cir. 2005), where the plaintiff lacked standing because it was "not likely to suffer any lost profits in the future." But in that case, the contract explicitly protected the plaintiff from the burden of increased costs. *Kitty Hawk*, 418 F.3d at 458. The opposite is true here, where the parties' contract expressly *allows* for unilateral termination if the situation becomes "financially unviable." Docket No. 34, Ex. 1 at 2. Even if Air Methods does not terminate the contract early for being "financially unviable," moreover, Air Methods may terminate the contract without cause in October 2023. *Id*. And LifeNet has shown that the Rule's QPA presumption will substantially increase the risk of less-favorable payment terms in negotiating a new contract. *See* Docket No. 27, Ex. 3 ¶¶ 3–4; *id.*, Ex. 2 ¶ 9–11. Thus, like the plaintiffs in *TMA*, LifeNet has established that its financial injuries are not only likely and imminent, but inevitable. *Id.*; *see also* Docket No. 32, Ex. 1 ¶ 5; Ex. 2 ¶ 5; Ex. 3 ¶ 5.

Defendants also attack redressability, claiming that a ruling favorable to LifeNet will not "motivat[e] Air Methods to provide higher fees for LifeNet's services." Docket No. 31 at 16. But LifeNet has shown that it is an "object" of the Rule, and "[i]f a plaintiff is an object of a regulation 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment

preventing or requiring the action will redress it.'" *Contender Farms, L.L.P.*, 779 F.3d at 264.  Further, for all the reasons stated above, LifeNet has also shown that the Rule with its QPA presumption substantially increases the risk of financial injury—either by a terminated contract or lower payments under a new contract— and that setting aside the Rule would make that injury less likely to occur.  Docket No. 27, Ex. 2 ¶¶ 9–11; *id.*, Ex. 3 ¶¶ 3–4.  That is sufficient to establish redressability and causation under Article III standing.  *See, e.g.*, *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 264–65 (1991) (finding that requested relief is "likely to redress [the] alleged injury" because "invalidation of the [unlawful exercise of] power will prevent [the injury]").

*     *     *

Accordingly, LifeNet has established Article III standing.

**B.**

LifeNet first asks the Court to set aside the Rule under the APA for the same reason the Court set aside the nearly identical rule in *TMA*:  it "conflicts with the statutory text."  Docket No. 27 at 12 (citing *TMA*, 2022 WL 542879, at *7).  "Nothing in the Act instructs arbitrators, in an air ambulance IDR, to 'weigh any one factor or circumstance more heavily than the others,'" yet the Rule does exactly that in favor of the QPA.  *Id.* at 13 (quoting *TMA*, 2022 WL 542879, at *8).  In response, Defendants repeat the arguments rejected by the Court in *TMA*.  They reiterate that the "overall statutory scheme" supports the Rule, they are entitled to "*Chevron* deference," and LifeNet misreads the Rule.  Docket No. 31 at 18–22.  Defendants, moreover, fail to articulate any reason why the Court should not follow *TMA* here,

18

stating only that they "respectfully disagree with [the *TMA*] decision."  Docket No. 31 at 22; *see also id.* at 22–23, 27.

Accordingly, for all the reasons stated in *TMA*, the Court holds that the Rule conflicts with the Act and must be set aside under the APA.   The Act unambiguously provides that arbitrators in an air ambulance IDR "shall consider" the QPA and several additional "circumstances."  42 U.S.C. § 300gg-112(b)(5)(C)(ii). Nothing in the Act instructs arbitrators to weigh any one factor or circumstance more heavily than the others.  *See id.*  Yet, the Rule requires arbitrators to "select the offer closest to the [QPA]" unless "credible" information, including information supporting the "additional factors," "clearly demonstrate[s] that the [QPA] is materially different from the appropriate out-of-network rate."   45 C.F.R. §§ 149.510(c)(4)(ii)(A), 149.520(b)(1)–(2).  The Rule thus "places its thumb on the scale for the QPA, requiring arbitrators to presume the correctness of the QPA and then imposing a heightened burden on the remaining statutory factors to overcome that presumption."  *TMA*, 2022 WL 542879, at *8.

Because the Rule "rewrites clear statutory terms," it must be "h[e]ld unlawful and set aside" for this reason alone.  *TMA*, 2022 WL 542879, at *8–9 (citing *Util. Air Regul. Grp.*, 573 U.S. at 328, 134 S. Ct. 2427; 5 U.S.C. § 706(2)(A)).

## C.

LifeNet also argues that the Rule should be vacated on the alternative ground provided in *TMA*:  Defendants bypassed the APA's requirement for notice and comment.  Docket No. 27 at 14–15 (citing *TMA*, 2022 WL 542879, at *10–12). In response, Defendants again repeat the arguments rejected in *TMA*.  They

contend that Congress authorized them to bypass notice and comment, the good cause exception applies here, and any failure to comply with the notice-and-comment requirement was harmless.  Docket No. 31 at 22–28.

These arguments remain unpersuasive.  The language cited by Defendants in arguing congressional authorization neither expressly nor implicitly exempts them from the APA's notice-and-comment requirement.  *See TMA*, 2022 WL 542879, at *10 (citing *Pennsylvania v. President of United States*, 930 F.3d 543, 566 (3d Cir. 2019), *rev'd on other grounds*, 140 S. Ct. 2367 (2020) and *California v. Azar*, 911 F.3d 558, 578–79 (9th Cir. 2018)).  Good cause does not apply because Defendants have not shown that complying with notice and comment was "impracticable" or "contrary to the public interest" as they now claim.  *Id*. at *11–12.[6]  And the error was not harmless.  It deprived LifeNet of notice and an opportunity to comment on the proposed rule.  Notice and comment would have almost certainly changed—even if in small part—the Rule's complex arbitration process.  And the anticipation of a final rule does not cure the error.  *See id*. at 13.

---

[6] Defendants cite *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022), which held that the agency had good cause to deviate from notice and comment because the rule was urgent and necessary to "significantly reduce COVID-19 infections, hospitalizations, and deaths."  Docket No. 31 at 25.  But an arbitration process for reimbursing healthcare providers lacks the same urgency and effects.  Defendants, moreover, claim that they needed to quickly implement the Rule to protect providers from insurers.  Docket No. 31 at 25 (citing 86 Fed. Reg. at 56,044).  But they have repeatedly stated that one of the purposes of the Rule is to limit providers from receiving *higher* payments.  *See Tex. Med. Ass'n*, 2022 WL 542879, at *9 (citing Case No. 6:21-cv-425-JDK, Docket No. 104 at 17; *id.*, Docket No. 62 at 10–11, 28; 86 Fed. Reg. at 56,061).

20

Accordingly, Defendants' failure to comply with the notice-and-comment requirement provides a second and independent basis to hold unlawful and set aside the Rule under the APA.[7]

## IV.

Having determined that the Rule violates the APA, the Court considers the proper remedy.

LifeNet asks the Court to vacate the final sentence of 45 C.F.R. § 149.520(b)(2), the final sentence of 26 C.F.R. § 54.9817-2T(b)(2), and the final sentence of 29 C.F.R. § 2590.717-2(b)(2).  Docket No. 1 ¶¶ 27, 60; Docket No. 27 at 1, 23.  Citing *TMA*, LifeNet argues that both the "seriousness of the deficiency" in conflicting with the Act and the "fundamental flaw" of failing to provide notice and comment make "remand with vacatur . . . the appropriate remedy."  Docket No. 32 at 20 (citing *Tex. Med. Ass'n*, 2022 WL 542879, at *14).  Defendants argue—as they did in *TMA*—that remand without vacatur is the appropriate remedy, citing a "serious possibility" that they can "substantiate [their] decision given an opportunity to do so."  Docket No. 31 at 30.

But as this Court held in *TMA*, the default rule is that "remand *with* vacatur is the appropriate remedy" in cases challenging agency action under the APA. *TMA*, 2022 WL 542879, at *14 (citing *Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir.

---

[7] Because the Court resolves the summary judgment motions in LifeNet's favor on statutory interpretation and notice-and-comment grounds, it need not reach LifeNet's third ground for vacatur (that the Departments allegedly acted in an arbitrary and capricious manner).

2021)).  This is especially true where the APA requires reviewing courts to "hold unlawful and set aside" unlawful agency action.  5 U.S.C. § 706(2).

Further, the same factors the Court considered in *TMA*—the "seriousness of the deficiencies of the action" and "the disruptive consequences of vacatur"—both weigh in favor of vacatur here.  *TMA*, 2022 WL 542879, at *14 (citing *Texas*, 20 F.4th at 1000).  *First*, the Rule "conflicts with the unambiguous terms of the Act," meaning that Defendants cannot justify the challenged portion of the Rule on remand.  *Id.* (citing *Sw. Elec. Power Co.*, 920 F.3d at 1022 (vacating and remanding part of final rule that was contrary to statute)).  *Second*, "vacatur will not be unduly disruptive" as the "remaining provisions of the Rule and the Act itself provide a sufficient framework" for all interested parties to resolve payment disputes.  *Id.* Defendants provide no reason to reconsider these factors.

As in *TMA*, "the ordinary result [of a court holding unlawful and setting aside unlawful agency rules] is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Franciscan All., Inc. v. Azar,* 414 F. Supp. 3d 928, 944–45 (N.D. Tex. 2019) (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)); *Tex. Med. Ass'n*, 2022 WL 542879, at *15.

The Court therefore finds that vacatur and remand is the proper remedy here.

## V.

In sum, the Court holds that (1) transfer is not proper, (2) LifeNet has standing to challenge the Rule, (3) the Rule conflicts with the unambiguous terms of

the Act, (4) Defendants improperly bypassed notice and comment in implementing the challenged portions of the Rule, and (5) vacatur and remand is the proper remedy.

Accordingly, the Court **DENIES** Defendants' motion to change venue or transfer (Docket No. 22), **GRANTS** LifeNet's motion for summary judgment (Docket No. 27), **DENIES** Defendants' cross-motion for summary judgment (Docket No. 31), and **ORDERS** that the following provisions of the Rule are **VACATED:**

(1) the final sentence of 45 C.F.R § 149.520(b)(2),

(2) the final sentence of 26 C.F.R. § 54.9817-2T(b)(2), and

(3) the final sentence of 29 C.F.R. § 2590.717-2(b)(2).

So **ORDERED** and **SIGNED** this **26th** day of  **July, 2022.**

_____
JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE